**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| AUDITBOARD, INC., a Delaware corporation, AUDITBOARD HOLDCO LP, a Delaware limited partnership, and AUDITBOARD HOLDCO G.P., LLC, a Delaware limited liability company, | |
| Plaintiffs, | Civil Action No.: |
| -against- | |
| LISA INDOVINO, an individual, | |
| Defendant. | |

<u>**MEMORANDUM IN SUPPORT OF PLAINTIFF'S ORDER TO SHOW CAUSE FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**</u>

**POLSINELLI PC**

<u>*/s/ Valerie Brown*</u>
Valerie Brown
NJ Bar ID No. 027152010
Three Logan Square
1717 Arch Street, Suite 2800
Philadelphia, PA, 19103
Tel: 215.267.3012
valerie.brown@polsinelli.com
*Attorneys for Plaintiffs*

1

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................ 8

II.   STATEMENT OF FACTS ................................................................. 10

    A.    AuditBoard's Business and Diligent's Competing Business. ..................................... 10

    B.    Defendant Served as a Senior Leader for AuditBoard and Voluntarily Agreed to a Non-Competition Agreement and Confidentiality Agreement. ................................... 11

    C.    Defendant Received and Is Intimately Familiar With AuditBoard's Trade Secret and Confidential Information. ................................................................. 13

    D.    AuditBoard Takes Reasonable Precautions to Protect its Trade Secret and Confidential Information. ................................................................. 14

    E.    Defendant Resigns from AuditBoard and Joins Diligent. ........................................ 15

III.  ARGUMENT ................................................................................... 17

    A.    AuditBoard Is Likely To Succeed On Its Claims ........................................ 18

        1.    AuditBoard Is Likely To Succeed on Its Claim Seeking To Enforce Defendant's Non-Competition Obligations. ........................................ 18

            a)    The non-compete obligation is enforceable because it is necessary to protect AuditBoard's legitimate business interests. ................................... 19

            b)    The non-compete obligation's scope is reasonable further supporting AuditBoard's legitimate business interest in its narrowly tailored RCA. ................................................................. 20

            a)    Enforcement of the RCA non-compete obligation will not impose undue hardship on Defendant. ................................... 25

            b)    Enforcing the RCA's non-compete obligation is in the public interest. .... 26

            c)    Defendant has breached the non-compete. ................................... 27

        2.    AuditBoard Is Likely To Succeed on Its Claim That Defendant Breached Her Confidentiality Obligations Under her Confidentiality Agreement ............ 29

        3.    AuditBoard Is Likely To Succeed on Its Claim of Violation of the Defend Trade Secrets Act ................................................................. 30

            a)    The information taken by Defendant constitutes a trade secret under the DTSA and related to interstate commerce. ........................................... 31

       b)    Defendant misappropriate or will inevitably misappropriate AuditBoard's trade secrets ........................................................................ 33

    B.    AuditBoard Is Likely To Suffer Irreparable Harm If Defendant Continues to Breach Her RCA and Confidentiality Agreement........................................... 35

    C.    The Balance of Equities Favors An Injunction. ........................................... 39

    D.    The Public Interest Favors Injunctive Relief.............................................. 40

IV.  CONCLUSION ................................................................................................. 40

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*A.T. Hudson & Co., Inc. v. Donovan*,
216 N.J.Super. 426, 524 *A.*2d 412 (App.Div.1987)...............................................................21

*A.T. Hudson & Co. v. Donovan*,
524 A.2d 412 (N.J. Super. 1987) ..........................................................................................21

*Acteon, Inc. v. Harms*,
2020 WL 6694411 (D.N.J. Nov. 6, 2020) ..........................................................18, 22, 30, 37

*ADP, LLC v. Kusins*,
460 N.J. Super. 368 (App. Div. 2019) ......................................................................18, 19, 22

*ADP, LLC v. Olson*,
2020 WL 6305554 (D.N.J. Oct. 28, 2020).............................................................................36

*ADP, LLC v. Pittman*,
2019 WL 5304148 (D.N.J. Oct. 18, 2019).............................................................................35

*CDK Glob., LLC v. Tulley Auto. Grp., Inc*.,
489 F. Supp. 3d 282 (D.N.J. 2020) .......................................................................................29

*Celsis In Vitro, Inc. v. CellzDirect, Inc*.,
664 F.3d 922 (Fed. Cir. 2012)...............................................................................................35

*Chemetall US Inc*. v*. LaFlamme*,
2016 WL 885309 (D.N.J. Mar. 8, 2016)................................................................................36

*Cmty. Hosp. Grp. Inc. v. More*,
365 N.J. Super. 84 (App. Div. 2003), *aff'd in part, rev'd in part sub nom. The
Cmty. Hosp. Grp., Inc. v. More*, 183 N.J. 36 (2005)....................................................21, 25, 26

*Comet Mgmt. Co., LLC v. Wooten*,
2020 WL 897973 (N.J. Super. Ct. App. Div. Feb. 25, 2020) ...........................................20, 25

*Commc'ns Workers of America v. McCormac*,
9 A.3d 1106 (N.J. Super. 2008) ............................................................................................33

*Corp. Synergies Grp., LLC v. Andrews*,
No. 18-13381, 2019 WL 3780098 (D.N.J. Aug. 12, 2019) ....................................................33

*Ethicon, Inc. v. Randall*,
2021 WL 2206106 (D.N.J. May 28, 2021) .......................................................................19, 20

*Flouramic, Inc. v. Trueba*,
   2005 WL 3455185 (N.J. Ch. Div. Dec. 16, 2005) ..................................................34

*HR Staffing Consultants LLC v. Butts*,
   627 F. App'x 168 (3d Cir. 2015) ....................................................................25, 39

*IDT Corp. v. Unlimited Recharge, Inc.*,
   No. 11-4992, 2012 WL 4050298 (D.N.J. Sept. 13, 2012) .....................................33

*Ingersoll-Rand Co. v. Ciavatta*,
   110 N.J. 609 (1988) ........................................................................................19, 26

*Interior Motives, Inc. v. Salvatore*,
   No. 20-5178, 2020 WL 2611517 (D.N.J. May 22, 2020)........................................17

*Jackson Hewitt Inc. v. Cline*,
   2015 WL 6687545 (D.N.J. Oct. 29, 2015).......................................................28, 37

*Lamorte Burns & Co., Inc. v. Walters*,
   770 A.2d 1158 (N.J.2001)......................................................................................33

*Mailman, Ross, Toyes & Shapiro v. Edelson*,
   183 N.J.Super. 434, 441, (Ch. Div.1982) .............................................................20

*Nat'l Reprographics, Inc. v. Strom*,
   621 F. Supp. 2d 204 (D.N.J. 2009) .................................................19, 21, 22, 25

*Nat'l Starch & Chem. Corp. v. Parker Chem. Corp.*,
   219 N.J. Super. 158 (App. Div. 1987) ...................................................................39

*Norwood Lumber Corp. v. McKean*,
   153 F.2d 753 (3d Cir. 1946)...................................................................................30

*Oakwood Labs v. Thanoo*,
   999 F.3d 892 (3d Cir. 2021)...................................................................................32

*Osteotech, Inc. v. Biologic, LLC*,
   2008 WL 686318 (D.N.J. Mar. 7, 2008).................................................................36

*Osteotech, Inc. v. Biologic, LLC*,
   No. 07-1296, 2008 WL 686319 (D.N.J. Mar. 8, 2008) ..........................................34

*Par Pharm., Inc. v. QuVa Parma, Inc.*,
   764 F. App'x 273 (3d Cir. 2019) ...........................................................................33

*Peoplestrategy, Inc. v. Lively Emp. Servs., Inc.*,
   2020 WL 7237930 (D.N.J. Dec. 9, 2020)...............................................................36

*Peoplestrategy, Inc. v. Lively Emp. Servs., Inc.*,
  2020 WL 7869214 (D.N.J. Aug. 28, 2020) .............................................................32

*PRS In Vivo Holdings, Inc. v. Peters*,
  24CV8223 (EP), 2024 WL 3995167 (D.N.J. Aug. 28, 2024).....................................17, 39, 40

*Reilly v. City of Harrisburg*,
  858 F.3d 173 (3d Cir. 2017)...................................................................................17

*Saturn Wireless Consulting, LLC v. Aversa*,
  2017 WL 1538157 (D.N.J. Apr. 26, 2017) .............................................................26

*Scholastic Funding Grp., LLC v. Kimble*,
  2007 WL 1231795 (D.N.J. Apr. 24, 2007) .............................................................22

*Schuhalter v. Salerno*,
  279 *N.J.Super.* 504, 653 A.2d 596 (App.Div.), *certif. denied,* 142 *N.J.* 454,
  663 *A.*2d 1361 (1995) ..........................................................................................21

*Signet Media, Inc. v. LG Elecronics, U.S.A., Inc.*,
  CV 24-4441 (ES), 2025 WL 3140917 (D.N.J. Nov. 10, 2025) .................................32

*Sunbelt Rentals, Inc.*,
  2021 WL 82370, at *17–18 .................................................................................22, 37, 39, 40

*Synthes, Inc. v. Gregoris*,
  228 F. Supp. 3d 421 (E.D. Pa. 2017) ....................................................................22

*Tilden Recreational Vehicles, Inc. v. Belair*,
  786 F. App'x 335 (3d Cir. 2019) ..........................................................................36

*U.S. Foodservice, Inc. v. Raad*,
  2006 WL 1029653 (N.J. Super. Ct. Ch. Div. Apr. 12, 2006) .................................36

*Von Rohr Equipment Corp. v. Modern Fasteners, Inc.*,
  No. 16-6675, 2017 WL 9690975 (D.N.J. May 18, 2017).......................................32

**Statutes**

18 U.S.C. § 1836(b)(1) .............................................................................................30

18 U.S.C. §§ 1836(b), 1839(3) .................................................................................32

18 U.S.C. § 1839 ......................................................................................................34

18 U.S.C. § 1839(3) .................................................................................................31, 32

18 U.S.C. § 1839(5) .................................................................................................31

Defend Trade Secrets Act ........................................................................................30, 31, 32, 33, 35

**Other Authorities**

Cambridge Dictionary....................................................................................................................35

Plaintiffs AuditBoard, Inc., AuditBoard HoldCo LP, and AuditBoard HoldCo G.P., LLC ("AuditBoard" or the "Company"), submit this brief in support of their Application for a Temporary Restraining Order ("TRO") and Preliminary Injunction restraining Lisa Indovino ("Defendant" or "Ms. Indovino") from continuing to compete against AuditBoard and using, disclosing, or otherwise misappropriating AuditBoard's trade secrets and confidential information.

## I.    **INTRODUCTION**

This case warrants emergency intervention to prevent irreparable harm. Defendant was a senior AuditBoard executive entrusted with the company's most sensitive customer information and competitive strategy. AuditBoard required a narrowly tailored non-competition agreement to protect that information. If Defendant is permitted to disregard that agreement and compete now, the harm will not be speculative—it will be immediate and irreversible, as AuditBoard's confidential information will inevitably be used against it in the marketplace.

AuditBoard is a leading provider of cloud-based software used by more than 2,500 enterprises, including nearly half of the Fortune 500, to manage audits, assess risk, and ensure compliance with regulatory requirements. Its competitive position depends not only on its technology, but on its confidential customer relationships, pricing structures, alliance strategies, and go-to-market plans—information that AuditBoard closely guards and shares only with trusted senior personnel. Defendant served as AuditBoard's Alliances Director, a role that placed her at the center of the Company's most sensitive strategic initiatives. She managed some of AuditBoard's most important strategic partnerships. She helped shape joint business plans and determined how AuditBoard's products would be positioned in the market. She worked directly with AuditBoard's sales, marketing, and product teams on core decisions affecting enterprise customers and revenue. To perform these duties, Defendant would be given (and was given) broad

access to AuditBoard's confidential customer information, pricing data, alliance strategies, competitive positioning, and non-public business plans.

As such, AuditBoard required Defendant to enter into a narrowly tailored Restrictive Covenants Agreement (the "RCA") and a Confidential Information and Invention Assignment Agreement (the "Confidentiality Agreement") precisely because of the sensitivity of this information and the competitive risk posed if it were disclosed or misused. Among other obligations, Defendant agreed that for a year following her departure from AuditBoard, she would not compete with AuditBoard, would not misuse or disclose AuditBoard's confidential information, and would not leverage that information to the detriment of the company. She further acknowledged—both contractually and expressly—that any breach of these obligations would cause irreparable harm for which monetary damages would be inadequate. As additional consideration for the RCA, Defendant was granted Phantom equity units, which are only provided to a handful of AuditBoard employees.

Despite freely agreeing to and accepting these terms and, in exchange, receiving access to AuditBoard's confidential and proprietary information, Defendant is refusing to comply with her post-termination non-compete obligation. Defendant resigned from AuditBoard and, within weeks, joined Diligent Corporation, a direct competitor, as its Vice President of Global Partners & Channels—a role that mirrors her former position at AuditBoard. In fact, in the days immediately preceding her departure, Defendant downloaded, transmitted, and attempted to print highly confidential AuditBoard customer and pricing information. Neither Defendant nor Diligent has denied her possession of this information, returned it, or provided assurances sufficient to mitigate the risk of its use. Nor has Defendant ceased her competitive role at Diligent.

Defendant's senior role at Diligent (undertaken in breach of her obligations to AuditBoard) closely parallels her former position at AuditBoard. Given the substantial overlap in responsibilities, her continued employment necessarily places her in a position where she will inevitably rely upon the confidential information she obtained, downloaded and retained at AuditBoard. Defendant accessed, acquired, and continues to possess AuditBoard's confidential information. In the hands of a competitor like Diligent, that information creates an imminent and irreparably threat to AuditBoard. Defendant and Diligent will inevitably use that information to unfairly compete during Defendant's non-competition period.  Courts consistently hold – and Defendant agreed in her RCA – that such harm cannot be remedied by monetary damages. Emergency relief is therefore necessary to prevent irreparable harm that cannot be undone.

## II.  STATEMENT OF FACTS

### A.  AuditBoard's Business and Diligent's Competing Business.

AuditBoard provides a cloud-based, software-as-a-service platform that enables enterprises to manage internal audit, risk, compliance, and environmental, social, and governance functions through an integrated governance, risk, and compliance solution. Compl. at ¶8. AuditBoard's platform replaces manual and spreadsheet-based systems with centralized tools that support regulatory compliance, internal controls, and enterprise-wide risk management. *Id*. AuditBoard's solutions are widely adopted and relied upon by more than 2,500 enterprises, including nearly half of the Fortune 500. Compl. ¶9. These solutions are critical to AuditBoard's customers, supporting core compliance and risk-management functions that are essential to enterprise operations. Compl. ¶10.

Diligent Corporation is a direct competitor of AuditBoard. Compl. ¶62. Like AuditBoard, Diligent provides a cloud-based, software-as-a-service platform offering governance, risk, compliance, audit, and related management solutions to large enterprises, nonprofit organizations,

and government entities. *Id*. Because AuditBoard and Diligent offer overlapping products and services in the same governance, risk, and compliance market, they compete for the same customers, strategic partners, and enterprise implementations. Defendant's move from AuditBoard to Diligent therefore places her in a competitive role within the same market in which she previously operated as a senior leader for AuditBoard. Compl. ¶63.

### B.    Defendant Served as a Senior Leader for AuditBoard and Voluntarily Agreed to a Non-Competition Agreement and Confidentiality Agreement.

Defendant joined AuditBoard on or about January 16, 2024, as its Alliances Director. Compl. ¶22. Defendant referenced her role as Managing Director Advisory Global Alliances" in her email signature block. In that senior role, she was responsible for cultivating, managing, and expanding AuditBoard's strategic partnerships and alliance relationships to drive market reach, revenue growth, and product adoption. Compl. ¶23. Defendant led the development of joint business plans with key partners, aligned AuditBoard's platform offerings with partner strategies, and worked closely with AuditBoard's sales, marketing, and product teams on go-to-market and co-selling initiatives. Compl. ¶¶24-26. Her work was central to AuditBoard's competitive positioning, market expansion, and relationships with professional services firms, systems integrators, and technology partners. *Id.*.

In connection with her employment, on or about December 4, 2024, and in exchange for the receipt of Phantom Units, Defendant voluntarily agreed to and signed the <u>RCA</u> with AuditBoard. Compl. ¶36. The RCA provided for continued access to AuditBoard's trade secrets, confidential information, customer and client goodwill, and specialized training or knowledge and certain Phantom Units through participation in AuditBoard's Phantom Incentive Unit Bonus Plan. Compl. ¶43. Under the RCA, she agreed that for a twelve-month period following the termination of her employment with AuditBoard, she would not engage in a Competitive Activity on behalf of

a Competitor within, in relevant part, the United States.[1] Compl. ¶¶37-40; Compl. at Ex. A. Specifically, the RCA's non-compete restricted her from accepting employment or otherwise rendering services in a similar or substantially similar capacity as she had in the twelve (12) months preceding her termination to a Competitor, defined as:

> any business (A) that engages in the design and development of financial controls, audit, risk, compliance, ESG or information security management products or services that have substantially similar functionality to the products or services offered by AuditBoard, Inc. within geographical areas in which the Partnership or any Group Company provides or offers these services or products, (B) whose products or services compete with products or services which the Group proposed to design, sell, or provide during the twelve (12) month period prior to the Termination Date *provided* such proposed products or services (x) have been discussed by the Board and are known to the Grantee, and (y) have not been the subject of a Board determination conclusively abandoning any further pursuit or development thereof, or (C) that otherwise engages in any business which the Partnership or any Group Company intends, in the following twelve (12) months, to actively pursue in a material respect, and which has been discussed by the Board and of which the Grantee has knowledge.

Compl. at Ex. A, Section 1.d.ii. She expressly acknowledged that the Company would "suffer irreparable harm as a result of any breach of any of [Defendant's] restrictive covenants" and that "monetary damages would not be an adequate remedy for any such breach." *Id*. at Section 3. Defendant further agreed that AuditBoard would "be entitled to seek to obtain remedies in equity, including, without limitation, specific performance, preliminary or other injunctive relief, a temporary restraining order, and/or a permanent injunction in any court of competent jurisdiction, to prevent or otherwise restrain any breach of any such provision(s) in [the RCA]. *Id.*

Defendant also entered into the Confidentiality Agreement on or about January 16, 2024. Compl. ¶48; Compl. Ex. B. Under that agreement, Defendant agreed to hold AuditBoard's confidential information in the strictest confidence, use it solely for AuditBoard's benefit, and not

---

[1] Defendant's non-compete also restricts her from competing in Canada, the United Kingdon, and any other country in which she provided services or had a material presence or influence for or on behalf of the Company during the twelve (12) months preceding her termination. Compl. at Ex. A, Section 1.d.vi.

make any copies without the Company's express authorization. Compl. at Ex. B, Section 3(a). The Confidentiality Agreement defined AuditBoard's "Confidential Information" as, among other things,

> "[I]nformation and physical material not generally known or available outside the Company and information and physical material entrusted to the Company in confidence by third parties" including but not limited to "lists of, or information relating to, suppliers and customers,…price lists, pricing methodologies, cost data, market share data, marketing plans…contract information, business plans, financial forecasts, [and] historical financial data…"

*Id*. at Section 3(b).

### C. Defendant Received and Is Intimately Familiar With AuditBoard's Trade Secret and Confidential Information.

As AuditBoard's Alliances Director, Defendant was given access to and entrusted with highly confidential and proprietary information and trade secrets concerning AuditBoard's short-term and long-term business strategies, partner strategy, pricing, customer relationships, competitive positioning, and product roadmap. Compl. ¶26. Her role gave her broad access to AuditBoard's internal systems and data, including its customer relationship management platform (Salesforce), which contained detailed information regarding partner-sourced and partner-influenced deals, customer identities, purchased modules, pricing, deal notes, and the reasons AuditBoard won or lost competitive opportunities. Compl. ¶¶ 27-32.

In the ordinary course of her responsibilities, Defendant regularly participated in senior-level discussions concerning AuditBoard's alliance strategy. *Id*. She had access to confidential partner contractual terms, sales performance metrics by partner and by product module, internal analyses showing partner win rates and deal values, and non-public information shared during Partner Advisory Board sessions, including strategic plans communicated by major partners regarding governance, risk, and compliance solutions. *Id*.

Defendant also had access to trade secret confidential and proprietary information concerning solutions being built by AuditBoard's partners, partner technical certification processes, subcontracting rates, and the internal structure, roles, and responsibilities of AuditBoard's alliances organization, including interview processes and compensation structures. *Id*. She further had access to contracted pricing, subscription agreements, order documentation, and recordings of customer demonstrations and sales calls, including calls discussing competitors, deal strategy, and objections. *Id*.

In addition, Defendant was exposed to AuditBoard's confidential competitive intelligence, including analyst positioning, sales training materials, product development roadmaps, and internal assessments of competitors and lost deals. *Id*. This information reflected AuditBoard's internal decision-making about how to compete, which customers and partners to prioritize, how to price and position its offerings, and when to introduce new products or features—information that AuditBoard closely guards and does not disclose outside the company. Compl. ¶¶ 20-21.

### D. AuditBoard Takes Reasonable Precautions to Protect its Trade Secret and Confidential Information.

The security of AuditBoard's confidential and proprietary information and trade secrets is of paramount importance to its business. *Id*. Accordingly, AuditBoard maintains a framework of contractual, policy-based, and technological safeguards designed to protect that information from unauthorized use or disclosure. Compl. ¶¶18, 56, 90 As a condition of her employment, and in the ordinary course of AuditBoard's business, Defendant was required to enter into written agreements expressly prohibiting the use or disclosure of AuditBoard's confidential information except for AuditBoard's benefit and acknowledging that misuse would cause irreparable harm. Compl. at Ex. B.

AuditBoard also limits access to its confidential information to employees whose roles require such access and employs technical controls to prevent unauthorized dissemination. Compl. ¶¶15-16. For example, when Defendant attempted to print a report containing highly sensitive and proprietary AuditBoard customer information shortly before her departure, AuditBoard's security systems blocked the attempt, demonstrating the Company's active use of technological safeguards to protect its confidential information. Compl. ¶56.

In addition, AuditBoard maintains its confidential customer, pricing, and competitive information within secure internal systems and restricts access to those systems based on legitimate business need. Compl. ¶¶15-16.) The information to which Defendant had access—including customer lists, pricing data, and strategic partner information—was not publicly available and was treated by AuditBoard as confidential and proprietary. Compl. ¶¶ 20, 27, 33. These measures reflect AuditBoard's reasonable and ongoing efforts to maintain the secrecy of its trade secrets and confidential information.

### E.    Defendant Resigns from AuditBoard and Joins Diligent.

On December 30, 2025, Defendant gave notice of her voluntary resignation. Compl. ¶55. Tellingly, shortly before resigning from AuditBoard, Defendant downloaded to her AuditBoard computer a report containing sensitive and proprietary customer information, including customer names, the dates on which deals with customers closed, the annual recurring revenue for customer deals, the different products customers purchased and how much they spent on those products, and notes regarding the source of the deal. Defendant attempted to print it, an effort that was blocked by AuditBoard's security systems as illustrated below. Compl. ¶56.



On January 6, 2026—two days before her last day at AuditBoard—Defendant sent an internal email to AuditBoard colleagues purporting to confirm outstanding commissions. Compl. ¶58.  Although framed as a routine internal communication, she copied her personal email address on the cc line, ensuring that AuditBoard information was simultaneously transmitted to a private, non-AuditBoard account while she was preparing to leave the Company. Defendant's last day with AuditBoard was January 8, 2026. Compl. ¶57. The information transmitted specifically contained highly confidential and proprietary customer information, including customer names, the dates on which deals with customers closed, the annual recurring revenue for customer deals, the different products customers purchased and how much they spent on those products, and notes regarding the source of the deal. Compl. ¶60.

Less than two weeks later, on or around January 22, 2026, Defendant announced that she had joined Diligent as Vice President, Global Partners & Channels. Compl. ¶61.



Diligent is a global provider of cloud-based software solutions focused on governance, risk, compliance, audit, and board management for large enterprises, nonprofit organizations, and government entities. Compl. ¶62. Like AuditBoard, Diligent offers SaaS products designed to support enterprise audit, risk, and compliance functions, and the two companies compete directly for the same customers, partners, and enterprise implementations. *Id*. In this competitive market, customer relationships, pricing structures, and partner strategies are closely guarded, non-public information that can provide a significant advantage if disclosed to or used by a competitor. Compl. ¶33.

Concerned by Defendant's actions and understanding their contractual rights pursuant to the RCA and Confidentiality Agreement, AuditBoard sent Defendant and Diligent a cease-and-desist letter on or about January 16, 2025. On January 28, 2025, counsel for AuditBoard learned Diligent retained counsel but had not received any further substantive response prior to filing this Motion.

### III.    <u>ARGUMENT</u>

The standard for issuing a temporary restraining order and a preliminary injunction is the same. *See Interior Motives, Inc. v. Salvatore*, No. 20-5178, 2020 WL 2611517, at *2 (D.N.J. May 22, 2020). "To obtain a temporary restraining order or preliminary injunction, the moving party must show: (1) a reasonable probability of eventual success in the litigation, and (2) that it will be irreparably injured ... if relief is not granted." *PRS In Vivo Holdings, Inc. v. Peters*, 24CV8223 (EP) (MAH), 2024 WL 3995167, *4 (D.N.J. Aug. 28, 2024) (quoting *Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017)). In addition, the Court "in considering whether to grant a preliminary injunction, should take into account, when they are relevant, (3) the possibility of harm

17

to other interested persons from the grant or denial of the injunction, and (4) the public interest." *Id*.

### A.    AuditBoard Is Likely To Succeed On Its Claims

> 1.    AuditBoard Is Likely To Succeed on Its Claim Seeking To Enforce Defendant's Non-Competition Obligations.

"[F]or more than a century, New Jersey has upheld restrictive covenants in employment agreements." *Acteon, Inc. v. Harms*, 2020 WL 6694411, at *4 (D.N.J. Nov. 6, 2020). New Jersey law "permit[s] 'the total or partial enforcement of noncompetitive agreements to the extent reasonable under the circumstances.'" *ADP, LLC v. Kusins*, 460 N.J. Super. 368, 400 (App. Div. 2019). A non-competition agreement is enforceable if it (1) "simply protects the legitimate interests of the employer," (2) "imposes no undue hardship on the employee," and (3) "is not injurious to the public." *Id*. New Jersey courts may "blue-pencil" non-competition agreements but "will rarely invalidate one in full." *Acteon, Inc*, 2020 WL 6694411, at *4.

AuditBoard is likely to succeed on the merits of its well-settled right to enforce its contract with Defendant. Defendant's RCA, which is expressly governed by New Jersey law,[2] is narrowly tailored to protect its legitimate interest in maintaining the secrecy of its confidential and proprietary business information. Defendant breached her non-competition obligations by commencing employment with Diligent on or about January 22, 2026, well before January 8, 2027 (the expiration of her non-compete, barring tolling), in the same or a similar role as the one she performed for AuditBoard. Defendant will not be unduly burdened by the enforcement of the RCA's non-competition obligations she voluntarily undertook, and courts have repeatedly held

---

[2] Defendant's RCA is clear on its face that the RCA, including the non-competition obligations contained therein, "shall be governed by and construed in accordance with the internal laws of NJ without giving effect to any choice or conflict of law provision or rule (whether of NJ or any other jurisdiction)." *See* Compl. Ex. A, Section 4.b.

that enforcement of non-competition provisions of employment-related contracts serve the public interest.

> a)    *The non-compete obligation is enforceable because it is necessary to protect AuditBoard's legitimate business interests.*

"An employer's legitimate interests include the protection of trade secrets or proprietary information," as well as "information that, while not a trade secret or proprietary, is nonetheless 'highly specialized, current information not generally known in the industry, created and stimulated by the . . . environment furnished by the employer, to which the employee has been exposed and enriched solely due to his employment.'" *ADP, LLC*, 460 N.J. Super. at 401 (quoting *Ingersoll-Rand Co. v. Ciavatta*, 110 N.J. 609, 638 (1988)); *see also Nat'l Reprographics, Inc. v. Strom*, 621 F. Supp. 2d 204, 226 (D.N.J. 2009) ("Employers have a right to contractually protect their confidential information" that is "unique and not generally known throughout the industry."). Employers have legitimate business interests in protecting "highly specialized, current information not generally known in the industry, created and stimulated by the research environment furnished by the employer, to which the employee has been 'exposed' and 'enriched' solely due to his employment," *Ingersoll-Rand Co*., 110 N.J. at 638, such as information about "strategic planning, financial performance, specific customers, products, services, customer proposals, approaches, revenue trends, marketing plans, and the overall goals and plans," *Nat'l Reprographics, Inc*., 621 F. Supp. 2d at 226–27, and the employer's "business strategies, product pipeline, financial condition, internal organization, and acquisition," *Ethicon, Inc. v. Randall*, 2021 WL 2206106, at *20 (D.N.J. May 28, 2021).

That is precisely the type of information that AuditBoard seeks to protect.

As AuditBoard's Alliances Director, Defendant had access to AuditBoard's most sensitive confidential information. Compl. at ¶¶ 26-32, 48. To assist sales teams, she had access to the entire

company's Customer Resource Management system, Salesforce, including but not limited to, information on AuditBoard's partner-sourced and influenced deals, customer lists, what modules/products were purchased, and pricing information. *Id*. Defendant had information related to AuditBoard's partner strategy including contractual terms for all partners and sales by partner, sales by partner by module/product. *Id*. Some of AuditBoard's most critical and competitive information was at Defendant's fingertips including AuditBoard's contract pricing, subscription agreements and terms, product order documentation, deals lost (and why), where the Company lost business to competitors, and other competitive intelligence. *Id*.

Defendant acknowledged in the RCA that her non-competition obligations are "fair, reasonable, and necessary … in order to protect the confidential information, trade secrets, customer and client goodwill, and other legitimate business interests of [the Company]." Compl. at Ex. A, Section 2. There is no basis to conclude otherwise. *See Ethicon, Inc*., 2021 WL 2206106, at *20 (employer had a legitimate interest in protecting information about the company's "product development pipeline," "strategic initiatives and development plans," and potential acquisitions, including information received at "confidential meetings and presentations").

> b)    *The non-compete obligation's scope is reasonable further supporting AuditBoard's legitimate business interest in its narrowly tailored RCA.*

The "duration, the geographic limits, and the scope of activities prohibited" of Defendant's non-competition obligations are "narrowly tailored to ensure the covenant is no broader than necessary to protect [AuditBoard's] interests." *See Comet Mgmt. Co., LLC v. Wooten*, 2020 WL 897973, at *5 (N.J. Super. Ct. App. Div. Feb. 25, 2020).

***Reasonable Duration.*** In terms of duration, New Jersey courts have repeatedly upheld restrictive covenants containing a two-year period of restriction as reasonable. *See, e.g.*, *Mailman, Ross, Toyes & Shapiro v. Edelson,* 183 N.J. Super. 434, 441 (Ch. Div. 1982) (finding

20

that two-year restrictions are generally reasonable); *A.T. Hudson & Co. v. Donovan*, 524 A.2d 412, 434 (N.J. Super. 1987) (upholding a two-year restrictive covenant); *A.T. Hudson & Co., Inc. v. Donovan,* 216 N.J. Super. 426, 524 (App. Div. 1987) (covenant restricting principal from soliciting business from consulting firm for two years held enforceable); *Schuhalter v. Salerno,* 279 N.J. Super. 504, 517 (App. Div. 1995), *certif. denied,* 142 N.J. 454, 663 (1995) (covenant restricting accounting partners from servicing each other's clients for two years found reasonable and enforceable; *Cmty. Hosp. Grp. Inc. v. More*, 365 N.J. Super. 84 (App. Div. 2003) (holding two-year restriction on performing neurosurgery reasonable and listing cases that have upheld two-year limitations), *aff'd in part, rev'd in part sub nom. The Cmty. Hosp. Grp., Inc. v. More*, 183 N.J. 36 (2005) (finding two-year period was reasonable for physician employee). Here, the non-competition obligation's duration is reasonable, as it is limited to a period of twelve months, *see* Compl. Ex. A, which is less than the two-year restriction generally upheld by New Jersey courts.

***Reasonable Geography.*** The RCA's non-competition obligation is reasonable in its geographic scope, which "must be analyzed in view of the specific facts presented in each case." *Nat'l Reprographics, Inc*., 621 F. Supp. 2d at 224. The RCA restricts Defendant from engaging in Competitive Activity (as defined therein) within, in relevant part, the United States,[3] which represents where Defendant provided services or had a material presence or influence for or on behalf of the Company during the twelve months preceding her resignation from AuditBoard. *See* Compl. at Ex. A, Section 1.vi. New Jersey courts regularly enforce non-competition agreements that prohibit employees from competing with their employer in the same geographic area in which

---

[3] Defendant's non-compete also restricts her from competing in Canada, the United Kingdon, and any other country in which she provided services or had a material presence or influence for or on behalf of the Company during the twelve (12) months preceding her termination. Compl. at Ex. A, Section 1.d.vi.

they worked, as Defendant is doing. See Compl. at Ex. A; *see also* ADP, LLC, 460 N.J. Super. at 378 (enforcing agreement restricting competition "in the same geographical territory in which the employee operated while at ADP"). Moreover, although AuditBoard has a material presence or influence across the world, courts recognize that "'[i]n this Information Age, a per se rule against broad geographic restrictions would seem hopelessly antiquated.'" *Nat'l Reprographics, Inc.*, 621 F. Supp. 2d at 225. Indeed, in some cases, courts have enforced non-competition agreements without geographical limitations where the employer's operations are "broad-ranging in its scope by the nature of its business." *Scholastic Funding Grp., LLC v. Kimble*, 2007 WL 1231795, at *5 (D.N.J. Apr. 24, 2007) (lack of geographic limitation in non-competition agreement for telemarketing company's Vice President of Operations was not unreasonable); *see also Sunbelt Rentals, Inc.*, 2021 WL 82370, at *17–18 ("New Jersey courts have enforced broad non-compete clauses, for instance nationwide or even global clauses, in circumstances similar to these" where the employee "was in a national role" and "had access to [the employer's] trade secrets, which were critical to their nationwide business interests"); *Acteon, Inc.* v. *Harms*, 2020 WL 6694411, at *7, *12 (enforcing nationwide noncompete clause against "high-level executive" who was "an integral part of [the employer's] management, commercial development, and product research and development" and was "entrusted [] with the most coveted information for the prosperity of the business and [the employer's] current and future business development strategies"); *Synthes, Inc. v. Gregoris*, 228 F. Supp. 3d 421, 432, 447 (E.D. Pa. 2017) (enforcing non-competition agreement governed by New Jersey law without any geographic limitations against Director of Commercial Integration of medical device company because the employee "was a high-level executive familiar with nationwide plans, strategies and information relevant to the medical device sales industry, which is global and broad-ranging by nature").

22

The scope of Defendant's non-competition obligations is necessary based on AuditBoard's global business and the global reach of Defendant's role. AuditBoard sells products in approximately 195 countries, to more than 2,500 customers across the United States. Compl. at ¶ 9. As AuditBoard's Alliances Director, Defendant was responsible for developing and managing strategic partner relationships that extended across AuditBoard's enterprise customer base. She recognized the global reach of her role during her employment with AuditBoard, as she referred to herself as "Managing Director Advisory Global Alliances" in her email signature block. Her role required her to work with national and international partners, coordinate cross-functional initiatives with AuditBoard's sales, marketing, and product teams, and help shape how AuditBoard's platform was positioned and sold in multiple markets. Given the scope of AuditBoard's business and the breadth of Defendant's responsibilities, her access to confidential information was not confined to a single customer, region, or market. Under these circumstances, the geographic scope of her post-employment restrictions is reasonable and necessary to protect AuditBoard's confidential information and competitive interests.

***Reasonable Scope of Restricted Activities.*** AuditBoard further ensured the non-compete obligations protected its legitimate business interests by narrowly tailoring the restricted activities to those that would cause it harm. The RCA's non-compete prevents Defendant from either: accepting employment in an executive, management, or supervisor role or providing any advice or services for or on behalf of any business:

> (1) that engages in the design and development of financial controls, audit, risk, compliance, ESG or information security management products or services that have substantially similar functionality to the products or services offered by AuditBoard within geographical areas in which the [the Company] provides or offers these services or products,
>
> or

Case 1:26-cv-00969    Document 3-1    Filed 01/30/26    Page 24 of 41 PageID: 67

(2) whose products or services compete with the products or services which the Group proposed to design, sell, or provide during the twelve (12) month period prior to [Defendant's termination date] provided such proposed products or services have been discussed by the Board and are known to [Defendant], and have not been the subject of a Board determination conclusively abandoning any further pursuit or development thereof, or that otherwise engages in any business which [the Company] intends, in the following twelve (12) months, to actively pursue in a material respect, and which has been discussed by the Board and of which [Defendant] has knowledge.

*See* Compl. at Ex. A, Section 1.a.ii, Section d.i-ii.

The scope of the restricted activity is narrowly tailored and reasonable. The RCA's non-compete does not bar Defendant from working generally in her field or industry. Instead, it prohibits only two specific categories of conduct during a limited post-employment period: (1) accepting an executive, management, or supervisory role with a defined "Competitor," or (2) providing services to a Competitor that are the same as, or similar to, the services she provided to AuditBoard during the twelve months preceding her departure. The restriction is thus function-based, not title-based, and is directly tied to the role Defendant actually performed at AuditBoard. Likewise, the definition of "Competitor" is carefully constrained. It is limited to businesses that offer products or services that are substantially similar to AuditBoard's governance, risk, compliance, audit, ESG, or information security solutions, or that compete with products AuditBoard actively pursued and that were known to Defendant through her work. The restriction does not sweep in unrelated companies or tangential markets; it applies only where there is a genuine risk that Defendant could use AuditBoard's confidential information to compete unfairly.

Taken together, these provisions reflect a deliberate effort to protect AuditBoard's legitimate business interests—its confidential information, strategic plans, and partner relationships—without imposing a broader restraint than necessary. Defendant remains free to work outside a competitive role, for non-competitors, or in positions that do not overlap with the sensitive functions she performed at AuditBoard. The RCA simply prevents her, for a limited

period, from stepping directly into a substantially similar senior role at a direct competitor where the misuse of AuditBoard's confidential information would be unavoidable. Under these circumstances, the scope of the restricted activity is reasonable and enforceable.

a)    *Enforcement of the RCA non-compete obligation will not impose undue hardship on Defendant.*

The Supreme Court of New Jersey has explained that "the reason for the termination of the parties' relationship is [] relevant" to determining whether "the restrictive covenant impose[s] no undue hardship on the employee." *More*, 183 N.J. at 59. "If the employee terminates the relationship, the court is less likely to find undue hardship as the employee put himself or herself in the position of bringing the restriction into play." *Id*.; *see also Comet Mgmt. Co., LLC*, 2020 WL 897973, at *7 ("[W]here the breach results from the desire of an employee to end his relationship with his employer rather than from any wrongdoing by the employer, a court should be hesitant to find undue hardship on the employee, he in effect having brought that hardship on himself."). A "hardship is not an impediment to enforcement of the restriction" where the employee "voluntarily resigned" to join a competitor because the employee "brought any hardship upon himself." *More*, 183 N.J. at 60; *see also HR Staffing Consultants LLC v. Butts*, 627 F. App'x 168, 172–73 (3d Cir. 2015) ("Butts left HR Staffing and joined CarePoint knowing that he was subject to a noncompete agreement that HR Staffing refused to waive. Hence, to the extent [his new position] has caused 'hardship,' he 'brought any hardship upon himself.'").

When Defendant was presented with the RCA, which provided for a grant of Phantom Units in exchange for the non-competition obligations, she "did not object to th[e] Agreement, nor attempt to negotiate different terms" before she executed it. *Nat'l Reprographics, Inc*., 621 F. Supp. 2d at 228. She subsequently resigned her employment with AuditBoard and informed the Company that she was leaving. Compl. ¶55. She then started a position with one of AuditBoard's

direct competitors. Compl. ¶61. Defendant could have sought employment that would not violate her non-competition obligations. Yet, she chose to take a competing role, denying AuditBoard the benefit of its bargain. Having chosen to voluntarily resign to join a direct competitor in the same or a similar role to the one she performed for AuditBoard, Defendant "brought any hardship upon [her]self." *More*, 183 N.J. at 60

> b) *Enforcing the RCA's non-compete obligation is in the public interest.*

Public interest here favors injunctive relief. That is because "the public has a clear interest in safeguarding fair commercial practices and in protecting employers from theft or piracy of trade secrets, confidential information, or, more generally, knowledge and technique in which employer may be said to have a proprietary interest." *IngersollRand Co*., 110 N.J. at 639. Enforcing restrictive covenants allows for marketplaces to remain competitive – if such restrictive covenants are stricken there would be almost no way for a company to keep proprietary information and trade secrets from the prying eyes of competitors. Conversely, not enforcing such restrictions would stifle businesses, competition, and innovation.

It would also have the effect of setting a dangerous precedent in encouraging other similarly situated employees to disregard their contractual duties. "Judicial enforcement of non-competition provisions of employment contracts serves the public interest by promoting stability and certainty in business and employment relationships." *Saturn Wireless Consulting, LLC v. Aversa*, 2017 WL 1538157, at *18 (D.N.J. Apr. 26, 2017). The public interest is directly implicated here, where Defendant was entrusted with AuditBoard's most sensitive information concerning its own internal portfolio and pipeline and analysis of potential external opportunities that, in the hands of a competitor, would have devastating and irreparable consequences for AuditBoard's business.

c)      *Defendant has breached the non-compete.*

Defendant has breached the non-compete by working for Diligent prior to January 8, 2027 (twelve months after the end of her employment with AuditBoard) in the same or similar role as the one she performed for AuditBoard at the time of her resignation.

*First*, Defendant has, at minimum, "accept[ed] employment in an executive, management, or supervisory role with a Competitor." *See* Compl. at Ex. A, Section 1.a.ii; 1.d.i-ii. The RCA defines "Competitor" as any business that engages in the design or development of audit, risk, compliance, ESG, or information security management products or services that have functionality substantially similar to those offered by AuditBoard, in the geographic areas where AuditBoard operates. Diligent meets that definition. Like AuditBoard, Diligent provides cloud-based software solutions focused on governance, risk, compliance, audit, and related enterprise management functions. The two companies compete for the same enterprise customers, offer overlapping product functionality, and operate in the same markets. The RCA also defines a "Competitor" to include businesses whose products or services compete with products AuditBoard proposed to design, sell, or provide during the twelve months prior to Defendant's departure, so long as those initiatives were known to her through her role. Given Defendant's senior position as Alliances Director—where she worked on partner strategy, go-to-market initiatives, and competitive positioning—she necessarily had knowledge of AuditBoard's current and planned offerings. Compl. at ¶¶ 27-32. Her move to Diligent therefore implicates precisely the competitive risks the RCA was designed to prevent. This is not a close call. Diligent operates in the same core market, offers substantially similar products, competes for the same customers, and hired Defendant into a senior role that mirrors her responsibilities at AuditBoard. Under any reasonable reading of the RCA, Diligent is a "Competitor," and Defendant's employment there constitutes prohibited competitive activity.

Moreover, she has "provid[ed] services for or on behalf of a Competitor which services are the same or similar in function or purpose as those Defendant provided to the Company during the twelve months preceding her resignation. *See* Compl. at Ex. A, Section 1.a.ii; 1.d.i-ii. Defendant was Alliances Director – she is now VP, Global Partners & Channels at Diligent. Although the titles differ, are substantially similar. Indeed, while at AuditBoard, Defendant referred to herself as "Managing Director Advisory Global Alliances," demonstrating the similarity of the two roles.

As Alliances Director at AuditBoard, Defendant was responsible for developing and managing strategic partner relationships, working with internal teams on go-to-market initiatives, and shaping how AuditBoard's products were positioned and sold through partners. That role required her to engage with partners, coordinate cross-functional efforts, and exercise judgment over alliance strategy and channel development. Defendant's current title of VP, Global Partners & Channels suggests a comparable focus on partner and channel relationships. While the precise contours of her responsibilities at Diligent are not yet known, the role appears, by its nature, to involve overseeing partnerships, coordinating with internal sales and marketing functions, and influencing how Diligent competes for enterprise customers through partners and channels. To the extent that role entails responsibilities similar to those Defendant performed at AuditBoard, it places her in a position where reliance on AuditBoard's confidential information would be difficult to avoid. *See Jackson Hewitt Inc. v. Cline*, 2015 WL 6687545, at \*4, \*5 (D.N.J. Oct. 29, 2015) (enjoining breach of non-competition agreement where the defendant was "in possession of [the plaintiff's] confidential information" and the plaintiff would be irreparably harmed from the "[d]efendant' potential use—or inevitable disclosure—of [that] information").

In short, Defendant is unquestionably in breach.

2.    AuditBoard Is Likely to Succeed On Its Claim that Defendant Breached Her
Confidentiality Obligations Under Her Confidentiality Agreement

Under New Jersey law, a successful claim for breach of contract requires proof of: (1) a valid and existing contract; (2) a breach of that contract by the defendant; (3) causation; and (4) damages. *See, e.g., CDK Glob., LLC v. Tulley Auto. Grp., Inc*., 489 F. Supp. 3d 282, 312 (D.N.J. 2020). Here, there is no question that the Confidentiality Agreement is a valid and binding contract. At the very outset of her employment, on January 16, 2024, AuditBoard required Defendant to enter into the Confidentiality Agreement "[a]s a condition of [Defendant] becoming employed [by the Company] and in consideration of [Defendant's] employment with the Company and [Defendant's] receipt of the compensation now and hereafter paid to [Defendant] by the Company." Defendant agreed to the terms and conditions set forth in the Confidentiality Agreement. *See* Compl. at Ex. B. Indeed, it was an exhibit to her offer letter. *Id*.

There is no question whether Defendant breached the Confidentiality Agreement. She did. Defendant's Confidentiality Agreement expressly states she would "hold in the strictest confidence, and not to use, except for the benefit of [AuditBoard] to the extent necessary to perform my obligations to the Company … and not disclose to any person, firm, corporation or other entity, without written authorization form the Company in each instance, any Confidential Information (as defined) that I obtain, access or create during the term of [my employment]." Compl. at Ex. B, Section 3(a). Crucially, Defendant further "agree[d] not to make copies of such Confidential Information except as authorized by the Company." Compl. at Ex. B, Section 3(a).

While preparing to leave AuditBoard and join Diligent, Defendant forwarded highly confidential information from her AuditBoard e-mail account to her personal e-mail account via cc'ing her personal e-mail on an internal team e-mail. That conduct is compelling evidence that Defendant violated the confidentiality provisions of her Confidentiality Agreement, which prohibit

her from using, disclosing, or retaining AuditBoard's confidential or proprietary materials. *See Aceton, Inc. v. Joseph B. Harms*, 2020 WL 6694411, *7 (D.N.J. Nov. 6, 2020) (concluding that the employer was likely able to prove that the former employee breached the noncompete and confidentiality provisions of his contract where, "[w]hile in a position entrusted with the most coveted information for the prosperity of the business and [the employer's] current and future business development strategies, [and plotting to leave his employer to join a competitor, the employee] emailed this information to himself at his private email address").

Finally, to prevail on a breach of contract claim, AuditBoard must show that Defendant's breach caused damage. In New Jersey, a breach of contract can lead to nominal damages, even where substantial loss has not been shown. Se*e Norwood Lumber Corp. v. McKean*, 153 F.2d 753, 755 (3d Cir. 1946). Here, however, the damage goes far beyond nominal. As noted above, AuditBoard's trade secret and confidential information derives its value specifically because it is kept confidential. The loss of that confidentiality, particularly to a direct competitor, can render the information useless and valueless. AuditBoard and Diligent both vie for the business of large enterprises seeking to use the software they both offer. Where AuditBoard's trade secret and confidential information on customer relations, pricing models, and product purchases are at issue, it is unarguable that Defendant's misappropriation (or inevitable use) of trade secret and confidential information caused and continues to cause losses to AuditBoard. Thus, Plaintiff is likely to succeed on the merits of its breach of contract claim.

      3.    <u>AuditBoard Is Likely To Succeed on Its Claim of Violation of the Defend Trade Secrets Act</u>

The Defend Trade Secrets Act ("DTSA") provides that "[a]n owner of a trade secret that is misappropriated may bring a civil action under this subsection if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. §

1836(b)(1). The statute defines misappropriation as requiring the "acquisition of a trade secret by another person who knows or has reason to know that the trade secret was acquired by improper means"" or "disclosure" or "use" of a trade secret acquired by improper means. 18 U.S.C. § 1839(5).

a)    *The information taken by Defendant constitutes a trade secret under the DTSA and related to interstate commerce*

The first question is whether the confidential information e-mailed by Defendant to her personal e-mail account constitutes a trade secret. It does. The DTSA states that:

> … the term "trade secret" means all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if— (A)the owner thereof has taken reasonable measures to keep such information secret; and (B)the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

18 U.S.C. § 1839(3). The Confidentiality Agreement defines "Confidential Information" as,

> information and physical material not generally known or available outside the Company and information and physical material entrusted to the Company in confidence by third parties. Confidential Information includes, without limitation: (i) Company Inventions (as defined below); (ii) technical data, trade secrets, know-how, research, product or service ideas or plans, software codes and designs, developments, inventions, laboratory notebooks, processes, formulas, techniques, biological materials, mask works, engineering designs and drawings, hardware configuration information, lists of, or information relating to, suppliers and customers (including, but not limited to, customers of the Company on whom [Defendant] called or with whom [Defendant] became acquainted during the [employment relationship]), price lists, pricing methodologies, cost data, market share data, marketing plans, licenses, contract information, business plans, financial forecasts, historical financial data, budgets or other business information disclosed to me by the Company either directly or indirectly, whether in writing, electronically, orally, or by observation.

Compl. at Ex. B, Section 3(b). To demonstrate the existence of a trade secret in a misappropriation claim brought under the DTSA, a plaintiff must sufficiently

31

identify the information it claims as a trade secret and allege facts supporting the assertion that the information is protectible as such. *See* 18 U.S.C. §§ 1836(b), 1839(3). In determining whether allegations about the identified information plausibly supports its having protected status as a trade secret, courts consider whether the owner of the information "has taken reasonable measures to keep . . . [it] secret" and whether the "information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information[.]" *Id*. § 1839(3). A plaintiff need not "spell out the details of the trade secret to avoid" dismissal. *Signet Media, Inc. v. LG Elecronics, U.S.A., Inc*., CV 24-4441 (ES) (JBC), 2025 WL 3140917 (D.N.J. Nov. 10, 2025) (quoting *Oakwood Labs v. Thanoo*, 999 F.3d 892, 913 (3d Cir. 2021)) . Rather, the subject matter of the trade secret must be described "with sufficient particularity to separate it from matter of general knowledge in the trade or of special knowledge of those persons who are skilled in the trade, and to permit the defendant to ascertain at least the boundaries within which the secret lies." *Id*.

Here, the information that Defendant had access to, including customer data, pricing models, and other sensitive information, clearly fits under the DTSA's definition of "trade secret." *See Peoplestrategy, Inc. v. Lively Emp. Servs., Inc*., 2020 WL 7869214, at *4 (D.N.J. Aug. 28, 2020) ("Trade secrets, under both New Jersey law and the DTSA, include proprietary business information like customer lists, pricing information, and marketing technique."); *see also, Von Rohr Equipment Corp. v. Modern Fasteners, Inc*., No. 16-6675, 2017 WL 9690975 (D.N.J. May 18, 2017) (allegation of trade secrets sufficiently stated where complaint alleged defendants took customer lists and plaintiff wrote cease and desist letters to prevent use of the information). Further, the specific document she e-mailed to her personal e-mail account specifically contained customer names, the dates on which deals with customers closed, the annual recurring revenue for customer deals, the different products customers purchased and how much they spent on those products, and notes regarding the source of the deal. Compl. ¶¶58-60.

All of this information allows AuditBoard to develop its products more efficiently and service its partners and customers with quality and precision greater than its competitors. AuditBoard's confidential information and trade secrets are not known outside the company; were

created by the company over many years of research involving large investments of capital and labor; were developed by the company for internal use only and with the expectation of deriving economic value. Compl. ¶¶ 20, 27, 33. This type of information related to developing customers and products clearly meets the definition of a trade secret under the DTSA. *See Corp. Synergies Grp., LLC v. Andrews*, No. 18-13381, 2019 WL 3780098, at *4 (D.N.J. Aug. 12, 2019) ("Customer lists, pricing information, and marketing techniques constitutes trade secrets under New Jersey law and the DTSA.") (citing, inter alia, *IDT Corp. v. Unlimited Recharge, Inc*., No. 11-4992, 2012 WL 4050298, at *6 (D.N.J. Sept. 13, 2012) (citing *Lamorte Burns & Co., Inc. v. Walters*, 770 A.2d 1158, 1166 (N.J. 2001) ("In New Jersey, customer lists of service businesses have been afforded protection as trade secrets"), and *Commc'ns Workers of America v. McCormac*, 9 A.3d 1106, 1123 (N.J. Super. 2008) ("A trade secret can consist of aspects of business operations such as pricing and marketing techniques."))).

Further, in requiring its employees to sign confidentiality agreements agreeing to never disclose, use, or divulge any of the AuditBoard's confidential information, *see, e.g.*, Compl. Ex. B, AuditBoard took reasonable measures to keep the information secret. *See Par Pharm., Inc. v. QuVa Parma, Inc*., 764 F. App'x 273, 278 (3d Cir. 2019) (concluding that the employer "took reasonable steps to protect the secrecy of its [trade secrets] through the use of non-disclosure agreements and appropriate facility security measures"). Thus, AuditBoard will be able to demonstrate the first element required to establish a violation under the DTSA.

b)    *Defendant misappropriate or will inevitably misappropriate AuditBoard's trade secrets*

The DTSA defines "misappropriation" as the (1) "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means" or (2) "disclosure or use of a trade secret of another without express or implied consent by

a person who[,]" inter alia, has employed "improper means to acquire knowledge of the trade secret." 18 U.S.C. § 1839. "Improper means" is defined as "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." *Id*. As discussed above and in the Verified Complaint, the available evidence demonstrates that Defendant unlawfully misappropriated AuditBoard's trade secret when she "acquired" and/or "disclos[ed]" it to her personal e-mail outside of AuditBoard without express or implied consent of AuditBoard. Her Confidentiality Agreement expressly prohibited "copying" any of AuditBoard's confidential and trade secret information, which necessarily includes sending a copy to a personal e-mail address two days prior to her last date of employment.

Even so, under the inevitable disclosure doctrine, "'an employer need not establish that its former employee has actually used or disclosed trade secrets.' Rather, an employer may demonstrate that 'there is a sufficient likelihood of inevitable disclosure of its trade secrets to a competitor." *Osteotech, Inc. v. Biologic, LLC*, No. 07-1296, 2008 WL 686319, at *3 (D.N.J. Mar. 8, 2008) (quoting *Flouramic, Inc. v. Trueba*, 2005 WL 3455185, at *8 (N.J. Ch. Div. Dec. 16, 2005)). AuditBoard is an established provider of governance, risk, and compliance software and has built its competitive position through proprietary customer relationships, pricing strategies, partner networks, and go-to-market execution. That position is grounded in confidential and non-public business information that AuditBoard closely guards. Diligent competes directly in the same market and seeks to grow by winning the same enterprise customers and strategic partners, making AuditBoard's confidential information particularly valuable in head-to-head competition.

Defendant was a senior AuditBoard leader with broad access to that information. As Alliances Director, she was entrusted with sensitive customer and pricing data, partner strategies, and competitive intelligence, and she developed deep familiarity with how AuditBoard competes

in the market. She then moved directly to Diligent in a senior partner-focused role that overlaps in subject matter and strategic focus with her former position. Given this background, the risk of misappropriation is substantial. Defendant retained confidential AuditBoard information as she transitioned to a direct competitor, and in a market with a limited universe of large enterprise customers and partners, even knowledge of AuditBoard's pricing, customer priorities, or partner strategies could provide an unfair competitive advantage. Absent injunctive relief, there is a meaningful risk that AuditBoard's confidential and trade secret information will be used or disclosed to the benefit of a direct competitor.

For the foregoing reasons, AuditBoard is likely to succeed on the merits of its claim under the DTSA, as Defendant pocketed AuditBoard's confidential information on her way out the door, which constitutes "trade secrets" as defined by that DTSA, and it is inevitable that Defendant will disclose such secrets to her new employer.

### B.    AuditBoard Is Likely To Suffer Irreparable Harm If Defendant Continues to Breach Her RCA and Confidentiality Agreement.

AuditBoard is likely to suffer irreparable harm if Defendant's non-competition obligations are not enforced. "Harm is considered 'irreparable' if it is not redressable by money damages later, in the ordinary course of litigation." *ADP, LLC v. Pittman*, 2019 WL 5304148, at *18 (D.N.J. Oct. 18, 2019). The Cambridge Dictionary defines "irreparable" as something which "impossible to repair or make right again."[4] While the definition is somewhat amorphous, it is well established that loss of business opportunities, goodwill, price erosion, and reputation qualify as irreparable harms. *See Celsis In Vitro, Inc. v. CellzDirect, Inc*., 664 F.3d 922, 930 (Fed. Cir. 2012). Further,

> Courts in the Third Circuit and this District have had no difficulty in finding that the loss of business opportunities and goodwill constitutes irreparable harm. Likewise. New Jersey courts recognize that "the diversion of a company's

---

[4]    *See* Cambridge Dictionary definition for "irreparable" available at https://dictionary.cambridge.org/us/dictionary/english/irreparable.

> customers may... constitute irreparable harm .... [T]his is so because the extent of the injury to the business as a result of this type of conduct cannot be readily ascertained, and as such, does not lend itself to a straightforward calculation of money damages.

*ADP, LLC v. Olson*, 2020 WL 6305554 (D.N.J. Oct. 28, 2020). Absent a temporary restraining order, Defendant will inevitably use AuditBoard's trade secret and confidential information to compete with it while working for Diligent, a direct competitor, the harm from which is immeasurable and cannot be calculated or redressed solely through monetary damages. "[A] trade secret once lost is, of course, lost forever." *Peoplestrategy, Inc. v. Lively Emp. Servs., Inc*., 2020 WL 7237930, at *3 (D.N.J. Dec. 9, 2020) (denying reconsideration of injunction against violation of non-solicitation agreement based, in part, on employee's misappropriation of confidential information). Thus, "an imminent possibility of disclosure of confidential information is sufficient to support a finding of irreparable harm." *Chemetall US Inc*. v. *LaFlamme*, 2016 WL 885309, *16 (D.N.J. Mar. 8, 2016).

New Jersey courts have recognized that "[i]t is a generally accepted principle that improper use of trade secrets constitutes irreparable harm" because "[d]amages will not be an adequate remedy when the competitor has obtained the secrets. The cat is out of the bag and there is no way of knowing to what extent their use has caused damage or loss." *U.S. Foodservice, Inc. v. Raad*, 2006 WL 1029653, at *7 (N.J. Super. Ct. Ch. Div. Apr. 12, 2006); *see also Osteotech, Inc. v. Biologic, LLC*, 2008 WL 686318, at *3 (D.N.J. Mar. 7, 2008) (an employer is irreparably harmed by the "'inevitable disclosure' of its trade secrets to a competitor" because "the extent of the injury to the business as a result of this type of conduct cannot readily be ascertained"); *see also Tilden Recreational Vehicles, Inc. v. Belair*, 786 F. App'x 335, 342 (3d Cir. 2019) (affirming temporary restraining order preventing employee from violating non-competition agreement because the employer "would have suffered irreparable harm" from the employee's work for a competitor in

violation of his obligations, including from the use of the employer's "confidential information"); *Sunbelt Rentals, Inc.*, 2021 WL 82370, at *26 ("Were [defendant] permitted to work at [competitor] in spite of the fact that he stole [plaintiff's] trade secrets, future irreparable harm to [plaintiff] would be likely and imminent."); *Acteon, Inc.*, 2020 WL 6694411, at *9–10 (employee would "inevitably disclose" employer's trade secrets, including "confidential [] data," "confidential analys[e]s," "information important and valuable enough to be presented to [employer's] board of directors," and information learned from "participation in various business development strategies and efforts" to competitor); *Jackson Hewitt*, 2015 WL 6687545, at *4 (a defendant's "potential use—or inevitable disclosure—of" a plaintiff's "confidential information" to a competitor "may constitute irreparable harm" under New Jersey law).

This is a paradigmatic case of the use of highly confidential and proprietary information and trade secrets creating a likelihood of irreparable harm. As described above, AuditBoard and Diligent are direct competitors. AuditBoard and Diligent operate in the same governance, risk, and compliance software market and offer overlapping solutions to large enterprise customers. Both companies compete for the same customers, the same strategic partners, and the same enterprise implementations in a market where relationships, pricing structures, and partner alignment are critical differentiators. Compl. at ¶¶62-63. Because enterprise customers typically make long-term platform decisions and engage in extended sales cycles, competition in this space is not episodic or abstract—it is ongoing and highly strategic. In the ordinary course neither company publicly discloses its internal pricing, customer pipelines, partner negotiations, or strategic priorities. Nevertheless, because the companies operate in the same market and target the same categories of enterprise customers and alliance partners, they necessarily compete for the same opportunities. In a market with a limited number of large enterprise buyers and strategic partners, information about

which customers or partners a competitor is—or is not—pursuing is itself highly sensitive and competitively valuable.

During her employment at AuditBoard, Defendant had intimate knowledge of and routinely worked with AuditBoard's most confidential and proprietary information, including its partner strategies, customer relationships, pricing considerations, and go-to-market plans. Compl. at ¶¶27-32. That information informed AuditBoard's decisions about which partners to prioritize, how to structure alliance relationships, and how to position its products in competition with companies like Diligent. Even knowledge about opportunities AuditBoard declined to pursue—or the reasons it did so—would provide a competitor with a significant and unfair advantage. Compl. at ¶63.

If Defendant continues to serve in a senior partner-focused role at Diligent during the restricted period, she will inevitably encounter the same types of strategic questions she addressed at AuditBoard: which partners to pursue, how to structure joint offerings, how to price and position products, and how to compete for enterprise customers. In addressing those questions, she cannot avoid being influenced—consciously or unconsciously—by her knowledge of AuditBoard's confidential strategies, customer priorities, and competitive assessments. That risk is particularly acute given the overlap in the companies' markets and the limited universe of enterprise customers and strategic partners.

Defendant expressly acknowledged in her agreements that AuditBoard would "suffer irreparable harm as a result of any breach of any of [Defendant's] restrictive covenants" and that "monetary damages would not be an adequate remedy for such breach." *See* Compl. at Ex. B, Section 3. The circumstances here present precisely the risk those agreements were designed to prevent: the inevitable use of a former employer's confidential information in a substantially

similar senior role at a direct competitor. Absent immediate injunctive relief, that harm cannot be undone. As courts have repeatedly recognized, that type of agreement "reflects the parties' acknowledgement that money may be insufficient to compensate the non-breaching party." *HR Staffing Consultants LLC*, 627 F. App'x at 174 n.8; *see also Nat'l Starch & Chem. Corp. v. Parker Chem. Corp.*, 219 N.J. Super. 158, 163 (App. Div. 1987) (affirming grant of preliminary injunction where employee "recognized" in his employment agreement that "the misuse or disclosure of trade secrets would irreparably damage the company" and that "an injunction against any use or disclosure of information obtained while employed . . . is appropriate pending the final decision by the court").

Absent a temporary restraining order or injunctive relief, the harm to AuditBoard from Defendant's inevitable use of its confidential and proprietary information while working for Diligent in violation of her non-competition obligations is immeasurable and could not be calculated or remedied through monetary damages.

### C.    The Balance of Equities Favors An Injunction.

The balance of equities weighs decidedly in AuditBoard's favor. As discussed above, in the absence of an injunction, AuditBoard stands to suffer irreparable injury by Defendant's inevitable use of confidential information to support Diligent's business. By contrast, Defendant will suffer far less harm if required to abide by the non-competition obligations to which she voluntarily agreed. "[I]f the employee terminates the relationship, the court is less likely to find an undue hardship because the employee prompted the restriction." *Peters*, 2024 WL 3995167, at *6; *see Sunbelt Rentals, Inc.*, 2021 WL 82370, at *21 (harm to employer from breach of non-competition agreement outweighed harm to employee from enforcement of that agreement because the employee "decided to resign from Sunbelt, knowing the limitations that faced him," and "[i]t is only fair that he is now held to those terms").

Moreover, Defendant engaged in conduct that undermines any claim of equitable hardship. On the eve of her resignation, she transmitted an internal email to her team purportedly to "confirm commissions," while attaching or referencing materials that contained highly confidential and competitively sensitive information. At the same time, she discreetly included her personal email address on the communication—despite knowing she was imminently departing the Company— thereby ensuring she retained access to confidential information outside AuditBoard's systems. That conduct was not inadvertent. It occurred at a moment when AuditBoard reasonably believed Defendant was winding down her role and acting consistently with her contractual obligations. Instead, Defendant took steps to retain confidential information under the guise of routine internal business, while obscuring her personal involvement by including her personal email address in a "cc" line. Equity does not favor a party who seeks to exploit technicalities or appearances to preserve access to sensitive competitive information while preparing to depart for a direct competitor. Any hardship Defendant now claims is the result of her own choices, whereas AuditBoard faces the immediate risk of irreparable harm absent injunctive relief.

### D.    The Public Interest Favors Injunctive Relief.

"Courts in this District have rightfully held that 'judicial enforcement of noncompetition provisions of employment contracts serves the public interest by promoting stability and certainty in business and employment relationships.'" *Sunbelt Rentals, Inc.*, 2021 WL 82370, at *22 (citing cases). "[A]s a practical matter, if a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury . . . it almost always will be the case that the public interest will favor the plaintiff." *Id*. That applies will full force here, for the reasons described above.

## IV.    <u>CONCLUSION</u>

The Court should issue a temporary restraining order and preliminary injunction requiring Defendant to adhere to the terms of her non-competition obligations to AuditBoard, plus equitable

tolling, and grant AuditBoard's application for expedited discovery to determine whether Defendant has further misappropriated its trade secret and confidential information.

Dated: January 30, 2026                    Respectfully submitted by:

**POLSINELLI PC**

*/s/ Valerie Brown*
Valerie Brown
NJ Bar ID No. 027152010
Three Logan Square
1717 Arch Street, Suite 2800
Philadelphia, PA, 19103
Tel: 215.267.3012
valerie.brown@polsinelli.com

*Attorneys for Plaintiffs*